UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JESSICA BELLEMORE,

      Plaintiff,

v.

                                         **Case No.**

SSS EDUCATION INC., d/b/a
JERSEY COLLEGE,

      Defendant.

_____

**MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR
<u>PRELIMINARY INJUNCTION</u>**

Plaintiff, JESSICA BELLEMORE, by and through her undersigned counsel, and pursuant to Fed. R. Civ. P. 65(a), Fed. R. Civ. P. 65(b), Middle District Rule 4.05 and 4.06, and this Court's inherent power, move for a temporary restraining order and/or preliminary injunction requiring Defendant to provide Plaintiff with qualified American Sign Language Interpreters for the clinical and lab portions of her courses in its Professional Nursing Program.

Plaintiff further requests if a Temporary Restraining Order and/or Preliminary Injunction is issued, the Court exercise its discretion to enter the Order without requiring Plaintiff to post bond.

Pursuant to Fed. R. Civ. P. 65(b)(1)(B), upon filing Plaintiff has provided notice of this Motion to Defendant's counsel via email and will serve Defendant pursuant to the Rules. In support of the Motion, Plaintiff states as follows:

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S APPLICATION
FOR TEMPORARY RESTRAINING ORDER AND/OR**

## **PRELIMINARY INJUNCTION**

## **INTRODUCTION**

Plaintiff, Jessica Bellemore, is a profoundly deaf individual who has dreamed of working in medicine since she was a small child. Ms. Bellemore earned admission to Defendant SSS Education Inc., d/b/a Jersey College's ("Defendant" or "the College") Professional Nursing Program at its Tampa Campus. However, the College has repeatedly refused to provide Ms. Bellemore with American Sign Language ("ASL") interpreters for the clinical and lab portion of her courses ("clinicals and labs") that are mandatory for her program.  As a result, Ms. Bellemore cannot understand what the patients, instructor, or her classmates are saying in clinicals and labs, and she cannot participate fully and equally in the clinicals and labs. Ms. Bellemore is about to begin her second and final year of Jersey College's nursing program — a year that will include a significant amount of clinical and lab courses. For this reason, Ms. Bellemore now respectfully moves for a temporary restraining order, seeking immediate relief, and preliminary injunctive relief, seeking provision of the ASL interpreters necessary for her to complete the mandatory coursework required to obtain her Associate's Degree in Nursing, to ensure that she has the same opportunity as hearing classmates to participate in and benefit from clinicals and labs.

## **STATEMENT OF FACTS**

"American Sign Language (ASL) is a complete, natural language that has the same linguistic properties as spoken languages, with grammar that differs from English. ASL is expressed by movements of the hands and face. It is the primary language of many North Americans who are deaf and hard of hearing, and is used by many hearing people as well."

*U.S. Dept. of Health and Human Services, Nat'l Inst. On Deafness and Other Communication Disorders*, available at https://www.nidcd.nih.gov/health/american-sign-language (last accessed Aug. 16, 2019). Qualified ASL interpreters accurately, effectively, and impartially interpret, both receptively and expressively, English into American Sign Language. *See* 28 C.F.R. § 36.104.

Ms. Bellemore has been profoundly deaf since birth. Declaration of Jessica Bellemore, attached as Exhibit 1 ¶ 2 (hereinafter "Bellemore Decl."). Her primary and most effective means of communication is ASL. *Id*.

Throughout her primary and secondary school education, Ms. Bellemore was provided with and utilized qualified ASL interpreters to understand and benefit from the information taught in the classroom as well as to communicate with her teachers and classmates. *Id*. at ¶¶ 3-5. Ms. Bellemore's education has always been extremely important to her, and she has dreamed of working as a medical professional since she was a small child. *Id*. at ¶5.

Ms. Bellemore applied for admission to Jersey College's Professional Nursing Program in January 2018. Bellemore Decl. ¶6. Along with her application, Ms. Bellemore submitted a formal request for ASL interpreters for all coursework. *Id*. The College granted her admission in May 2018, and she began taking courses at that time, with the provision of a qualified ASL interpreter. *Id*. at ¶7. However, after only one week of classes, the interpreter informed Ms. Bellemore that the interpretation services had been cancelled by the College. *Id*. at ¶8. Ms. Bellemore then contacted the College regarding the cancellation of the interpreter services and learned from a staff member that the College was still reviewing her

3

request for accommodations and that she was being withdrawn from her courses pending the completion of the College's review. *Id*. The College finally granted Ms. Bellemore's request for an ASL interpreter, in part, on July 27, 2018, seven months after she first submitted her application and request for accommodations, and she was approved to restart the program in the August 2018 quarter. *Id*. at ¶¶ 9; 11.

Significantly, the College's approval of Ms. Bellemore's request was limited to an ASL interpreter for classroom lectures; the College refused to provide an ASL interpreter for clinical or lab settings. *Id*. at ¶9.  Instead, the College created a "buddy-system", in which the College would assign Ms. Bellemore a classmate "buddy" for activities required to be completed in the clinicals or labs. *Id*. at ¶10; *see also* Ltr. from Jersey College dated July 27, 2017 [sic], attached as Exhibit 2.

Ms. Bellemore began the program in August 2018. Bellemore Decl. ¶11. From August 2018 until February 2019, Ms. Bellemore was enrolled in only lectures and had interpreters for all of her classes. *Id*. She did very well academically. *Id*.

In early January of 2019, in anticipation of the February quarter and the beginning of clinical and lab courses, Ms. Bellemore again inquired into the accommodations the College would provide for clinicals and labs, informing the College that the "buddy system" would not provide her with effective communication, and again requesting a qualified ASL interpreter. *Id*. at ¶12. The College informed Ms. Bellemore that it would not provide her with a qualified ASL interpreter for clinicals and labs, but would change the classmate "buddy-system" it had offered in July to a "one-on-one instructor" for clinicals and labs. *Id*.

Ms. Bellemore began her first clinical in February 2019 and was provided with an "instructor" who sat with her during the clinical class and attempted to communicate what was being taught in the class to Ms. Bellemore through a combination of very basic sign and texting over their phones. *Id*. at ¶13. The instructor was not a qualified interpreter and Ms. Bellemore struggled to understand the information taught during class. *Id*. The College then separated Ms. Bellemore and the "instructor" from the clinical course and Ms. Bellemore was provided with one-on-one instruction until that clinical ended, in April of 2019. *Id*.

The purpose of clinical course work is to provide students with practical experience working with patients independently, under an instructor's supervision. Bellemore Decl. ¶27. During clinicals, students work with patients independently, under the instructor's supervision, but because Ms. Bellemore was paired exclusively with the instructor, she could not effectively interact with the clinical patients, was not able to work independently, and was deprived of the practical experience the clinical course is meant to provide. *Id*. Additionally, clinicals and labs often involve group activities and assignments, but Ms. Bellemore was isolated from her classmates and unable to participate in these group assignments because she had to rely exclusively on the instructor to relay all information conveyed during class. *Id*. at ¶26. Thus, the use of the instructor also deprived Ms. Bellemore of the opportunity to collaborate with, learn from, and participate in a group exchange with her classmates. *Id*.

In May of 2019, Ms. Bellemore began her second clinical; the College assigned her a different one-on-one instructor and she was placed back into the clinical classroom with her classmates. *Id*. at ¶16. Although the school used the term "one-on-one instructor," the second

instructor was an instructor of a different course, who would attempt to simultaneously listen to the clinical instructor's lecture and mouth a paraphrased version of what she heard to Ms. Bellemore. *Id.* at ¶17. The College's proposed "accommodation" did not provide Ms. Bellemore with the benefit of individualized instruction from the course instructor and acted more like an "instructor-buddy." [1] *Id.* Moreover, the instructor buddy also failed to mouth to Ms. Bellemore any questions asked by the other classmates or the answers provided by the clinical instructor. *Id.* at ¶18. Further, at times, videos shown in clinicals were captioned with machine-generated captioning, which were frequently inaccurate, depriving Ms. Bellemore of the information conveyed in the video. *Id.* at ¶19. While the instructor buddy attempted to paraphrase these videos, because she failed to sit next to the television, Ms. Bellemore could not simultaneously attempt to lip read the instructor buddy and watch the video. *Id.*

Ms. Bellemore's ability to lip read is limited to informal conversations with individuals she knows well. She cannot lip read multiple people at one time nor can she lip read in more formal settings, like a classroom, where medical terminology and unfamiliar vocabulary are used. *Id.* at ¶21. Clinicals and labs take place over an extended period of time[2]; attempting to lip read a paraphrased version of the course instruction for an extended period of time left Ms. Bellemore exhausted and suffering from headaches. *Id.* at ¶22. She was unable to understand the majority of what the instructor buddy mouthed to her and missed a substantial portion of the information relayed during class. *Id.* at ¶¶ 22-24.

Due to Jersey College's refusal to provide qualified sign language interpreters, Ms. Bellemore struggled to comprehend the information taught during clinicals and labs and was

---

[2] While some of the labs are 4.5 hours at a time, most of the clinicals are 8 hour blocks.

unable to fully participate in collaborative assignments. *Id.* at ¶¶23-26. The clinical and lab settings are crucial to Bellemore's success in the program; students in the Professional Nursing program are given letter grades according to their performance in the classroom portion of the program but either pass or fail the clinical or lab portions. *Id.* at ¶28. Regardless of a student's letter grade in the classroom portion, failing a clinical or lab denotes failure in the program overall. *Id.* at ¶28. Although Ms. Bellemore ultimately passed the clinical and lab portions of her course, she missed a significant amount of information relayed by both the clinical instructor and her classmates and was isolated from the group experience. *Id.* at ¶¶24; 26. Thus, in early March of 2019, Ms. Bellemore renewed her request for qualified ASL interpreters in clinical and lab settings by submitting an appeal to the College regarding its insistence on using the instructor buddy for clinicals and labs. *Id.* at ¶14.

Almost three months later, in a letter dated May 29, 2019, and only after Ms. Bellemore repeatedly contacted the College to follow up on her March appeal, the College again denied Ms. Bellemore's request for qualified ASL interpreters during clinicals and labs, claiming that the provision of an ASL interpreter in clinicals and labs would "necessitate a substantial lag time while each classroom comment or question is interpreted" and would distract both Ms. Bellemore and her classmates. Ltr. dated May 29, 2019 attached as Exhibit 3; *see also Id.* at ¶15.

ASL interpreters are regularly used not only in clinical portions of nursing school programs but in clinical courses in medical schools. *See* Declaration of Richard Rice, attached as Exhibit 4; Declaration of Diane Boss, attached as Exhibit 5; and Declaration of

Christopher Moreland, M.D., attached as Exhibit 6. In fact, there are numerous successful deaf medical health care professionals in the United States, working in all aspects of health care, including nursing. *See* Exhibit 6 ¶¶10-11.

Ms. Bellemore's classes began on August 12, 2019. During the August quarter Ms. Bellemore's program requires her to complete one clinical course; in November of 2019, Ms. Bellemore will be required to complete two clinical courses. Bellemore Decl. ¶28. Ms. Bellemore will be provided with an interpreter for the orientation of her clinicals and labs only; the orientation for her August quarter clinical was scheduled for August 13, 2019. *Id*.

## ARGUMENT

A plaintiff must establish four elements to obtain either a temporary restraining order or a preliminary injunction: "(1) [s]he has a substantial likelihood of success on the merits, (2) [s]he will suffer irreparable injury unless the injunction issues, (3) the injunction would not substantially harm the other litigant, and (4) if issued, the injunction would not be adverse to the public interest." *Long v. Secretary, Dep't. of Corr.*, 924 F.3d 1171, 1176 (11th Cir. 2019)."The evidence presented for each of those criteria is balanced by the court on a sliding scale analysis: a much stronger showing on one or more of the necessary factors lessens the amount of proof required for the remaining factors." *Collins & Co., General Contractors v. Claytor*, 476 F. Supp. 407, 409 (N.D.Ga.1979)) (citing *Texas v. Seatrain International, S.A.*, 518 F.2d 175 (5th Cir. 1975); *Siff v. State Democratic Executive Committee*, 500 F.2d 1307 (5th Cir. 1974)). As shown below, these four factors strongly weigh in favor of granting both a temporary restraining order and a preliminary injunction

requiring the College to provide an ASL interpreter for Ms. Bellemore during clinicals and labs.

### A.    Ms. Bellemore is Likely to Succeed on the Merits.

To prevail on her claims under Title III of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504"), Ms. Bellemore must prove that (i) she is a qualified individual with a disability; (ii) the Defendants own lease or operate a place of public accommodation and/or receive federal funding; and (iii) she was excluded from participation in, or denied the opportunity to benefit from the public accommodation's services, and/or was otherwise discriminated against by the public accommodation by reason of her disability. *See* 42 U.S.C. § 12182 (2012); 29 U.S.C. § 794(a) (2012); *See also Ali v. City of Clearwater*, 915 F. Supp. 1231, 1238 (M.D. Fla. 1996) (citing 29 U.S.C. § 794(a) (1988)); *Norkunas v. Seahorse NB, LLC*, 444 F. App'x 412, 416 (11th Cir. 2011) (citing 42 U.S.C. § 12182(a)).

Pursuant to the statute and United States Department of Justice ("DOJ") regulations implementing Title III, which are entitled to substantial deference, *see Doe v. Judicial Nominating Com'n for Fifteenth Judicial Circuit of Florida*, 906 F. Supp. 1534, 1540 (S.D. Fla. 1995), discrimination occurs when a place of public accommodation denies an individual with a disability the opportunity to "participate in or benefit from [its] goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. § 12182(b)(1)(A)(i); 28 C.F.R. § 36.202(a). Covered entities must provide necessary auxiliary aids and services, such as qualified ASL interpreters, to ensure effective communication with deaf and hard of hearing individuals. *See* 42 U.S.C. § 12182(b)(2)(A)(ii); 28 C.F.R. § 36.303(c)(1) ("A public

accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities."). In addition to providing effective auxiliary aids and services, places of public accommodation must provide services in the most integrated setting appropriate. 28 C.F.R. § 36.303(a) ("A public accommodation shall take those steps that may be necessary to ensure that no individual with a disability is … segregated.").

The Eleventh Circuit has held that the appropriate inquiry under the Rehabilitation Act is to assess whether an individual has been afforded "an equal opportunity to benefit" from a public accommodation. *Liese v. Indian River Cty. Hospital Dist.*, 701 F.3d 334, 343 (11th Cir. 2012). "The meaningful access standard to ensure an equal opportunity is consistent with the purpose of Title III of the ADA, which is to ensure that all people have 'full and equal enjoyment' of public accommodations regardless of disability." *Argenyi v. Creighton Univ.*, 703 F.3d 441, 449 (8th Cir. 2013).

With the exception of its federal funding requirement, Section 504 uses the same standards as the ADA, and therefore, cases interpreting either are applicable and interchangeable. *Badillo v. Thorpe*, 158 Fed. Appx. 208, 214 (11th Cir. 2005) (citing *Cash v. Smith,* 231 F.3d 1301, 1305 &n. 2 (11th Cir. 2000)); *see also Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 830-31 (11th Cir. 2017) ("ADA and RA claims are governed by the same substantive standard of liability.").[3]

i. Ms. Bellemore is a Qualified Individual with a Disability.

---

[3]Indeed, cases interpreting the Rehabilitation Act are "persuasive authority" when interpreting the ADA due to the acts' similarities in purpose. *Tugg v. Towey,* 864 F. Supp. 1201, 1205 n.4 (S.D. Fla. 1994) (granting deaf plaintiffs' preliminary injunction for mental health counselors proficient in sign language).

The Rehabilitation Act defines "individual with a disability" in relevant part as "any person who has a disability as defined in section 3 of the Americans with Disabilities Act of 1990 (42 U.S.C. 12102)." 29 U.S.C. § 705(20)(B). Section 3 of the Americans with Disabilities Act of 1990 defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual" 42 U.S.C. § 12102(1)(A); "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, *hearing*, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A) (emphasis added). A qualified individual with a disability is defined by Title III as being "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices … or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). As a deaf individual, Ms. Bellemore is substantially limited in the major life activity of hearing; additionally, she is clearly qualified to attend the College's professional nursing program based on her acceptance to the program in May of 2018. *See* Bellemore Decl. ¶¶7; 11. As such, she is a qualified individual with a disability under both Section 504 and Title III of the ADA. *See* 34 C.F.R.§ 104.3(l)(3) (defining an otherwise qualified individual, for the purposes of Section 504, as an individual with a disability "who meets the academic and technical standards requisite to admission or participation in the recipient's education program.").

### ii. The College is subject to Title III of the ADA and Section 504 of the Rehabilitation Act.

Title III of the ADA was enacted to facilitate access to places of public accommodation, including private colleges such as Defendant, Jersey College, for individuals with disabilities. *See* 42 U.S.C. § 12181(7)(J) (listing a "postgraduate private school" as a covered entity). Additionally, the College receives federal financial assistance, subjecting it to the requirements of Section 504 of the Rehabilitation Act. *See* https://www.usaspending.gov/#/award/49486701 (establishing that SSS Education Inc. received over nine million dollars in federal grants over a six-year period) (last assessed on August 17, 2019). Plaintiff has thus made a clear showing that the College is subject to both Title III of the ADA and Section 504 of the Rehabilitation Act.

> iii. Ms. Bellemore has been excluded from and denied the opportunity to participate in the clinical and lab portions of the nursing program by reason of her disability.

Title III ensures qualified individuals with disabilities are enabled to participate "in the full and equal enjoyment" of the "privileges, advantages, or accommodations" offered by a place of public accommodation. 42 U.S.C. § 12182(a). In providing individuals with disabilities "full and equal enjoyment" of services, covered entities must provide necessary auxiliary aids and services, such as qualified ASL interpreters, to ensure effective communication with deaf and hard of hearing individuals. *See* 42 U.S.C. § 12182(b)(2)(A)(ii); 28 C.F.R. § 36.303(c)(1) ("a public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities"). Moreover, Section 504 of the Rehabilitation Act prohibits Defendant from discriminating against qualified individuals with disabilities. *See* 34 C.F.R. § 104.4(a). Discrimination under Section 504 includes "afford[ing] a qualified …

person [with a disability] an opportunity to participate in … the service that is not equal to that afforded others." 34 C.F.R.§ 104.4(b)(ii).

The rights of deaf and hard of hearing students to have meaningful access to higher education under Section 504 and the ADA have been consistently recognized and upheld by federal courts. *See U.S. v. Bd. of Trustees for Univ. of Alabama,* 908 F.2d 740, 752 (11th Cir. 1990) (holding that universities must provide auxiliary aids and services to students with disabilities irrespective of financial aid qualification).

In *Argenyi v. Creighton Univ.*, the district court, on remand from the Eighth Circuit, granted permanent injunctive relief to a deaf plaintiff after a jury found that the Defendant university discriminated against the deaf plaintiff by withholding the accommodations necessary for him to effectively communicate and provide meaningful access to a medical education. No. 8:09CV341, 2013 U.S. Dist. LEXIS 195159*10 (D. Neb. 2013). Importantly, like the facts set forth here, the deaf plaintiff in *Argenyi* brought suit against the university after it would not allow him to use interpreters in certain clinical settings. *Id* at *2. As the Eighth Circuit declared in reversing the district court's original decision to grant summary judgment to the university defendant, "the ADA and the Rehabilitation Act require [the university] to 'start by considering how [its educational programs] are used by non-disabled [medical school students] and then take reasonable steps to provide [Argenyi] with a like experience.'" *Argenyi*, 703 F.3d at 450-451 (quoting *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012)).

As the district court noted when later granting the injunctive relief to Argenyi, "[t]he U.S. Court of Appeals for the Eighth Circuit made clear its opinion that, '[i]n a case such as

this it is especially important to consider the complainant's testimony carefully because the individual with a disability is most familiar with his or her disability and is in the best position to determine what type of aid or service will be effective.'" *Argenyi*, 2013 U.S. Dist. LEXIS 195159, *5-6 (quoting *Argenyi*, 703 F.3d at 446). Like Ms. Bellemore, without the provision of his requested accommodation—one he had utilized in an educational setting since the eighth grade, Argenyi testified he was "unable to follow class lectures and classroom dialogue" or "the rapid pace of dialogue in the clinical setting." *Id.* at 446. He was also substantially disadvantaged in his ability to succeed in the clinical setting as he was unable to communicate effectively with patients and patients' family members. *See id.*

In *Featherstone v. Pac. Nw. Univ. of Health Sci.,* the district court granted a preliminary injunction requiring a medical school to provide sign language interpreters to a deaf student. In that case, a deaf student enrolled in an osteopathic medicine program had his admission significantly delayed and then ultimately withdrawn by the defendant university after it determined his request to use a sign language interpreter and captioning services would "compromis[e] the educational experiences for classmates," among other concerns including that of patient safety. No. 1:CV-14-3084-SMJ, 2014 WL 3640803 at *1-2 (E.D. Wash. 2014).

The court granted a preliminary injunction, finding that Featherstone was likely to succeed on the merits because he had a disability, was qualified to be enrolled in the program, was withdrawn from the program because of his disability, and that PNWU received federal financial assistance. The court concluded that "interpreters for clinical settings" … would allow [him] to learn in the classroom and in the clinical settings, as well

as, interact with fellow students and patients in the clinic settings," *Id.* at *4, and ordered the university defendant to provide Featherstone with sign language interpreters and captioning services. *See id.* at *8.

Without a qualified sign language interpreter, Ms. Bellemore cannot meaningfully participate in the clinical and lab portions of her courses and is isolated from her classmates. *See* Bellemore Decl. ¶¶13; 16-27. Thus, like the cases above, a sign language interpreter is necessary to ensure that Ms. Bellemore has an opportunity equal to that of hearing classmates to participate in and benefit from attending clinicals and labs. The College has recognized Ms. Bellemore's need for a qualified interpreter to achieve effective communication in lectures; its refusal to provide the same sign language interpreter services for the clinical and lab portions of her courses makes little sense, deprives Ms. Bellemore of the same opportunity to benefit from the clinicals and labs as hearing students, and is discriminatory.

Moreover, the College's decision to provide an instructor buddy, one who has no training in any form of interpretation, cannot be considered an effective auxiliary aid or service under Title III of the ADA or its implementing regulations as it fails to provide Ms. Bellemore with an effective means of communication. As the Eleventh Circuit has made clear, when assessing the effectiveness of an auxiliary aid, "[t]he correct standard examines whether the deaf [plaintiff] experienced an impairment in his or her ability to *communicate*. . . . The focus is on the effectiveness of the communication." *Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 833 (11th Cir. 2017).

As Ms. Bellemore testified in her declaration, she cannot understand the instructor buddy; the instructor buddy fails to mouth the students' questions and the instructors'

answers and segregates her from the group work the clinical environment is meant to facilitate. Bellemore Decl. ¶¶13-27. Ms. Bellemore's potential for growth in the program is stunted as she is prevented from working with her peers in group assignments and is limited to only working with the staff member assigned to her: This is not the meaningful opportunity to benefit and the equal access to the program mandated by the statutes. Whereas her classmates in clinicals and labs learn in groups, she is left alone with her instructor buddy, deprived of the opportunity to learn from her classmates, their insights, their mistakes, and their comments as they learn together in clinicals and labs. *See Id.* at ¶26. Thus, the College's "buddy" system not only results in ineffective communication, it segregates Ms. Bellemore from her classmates—in direct violation of the ADA and Section 504—which explicitly prohibit placing deaf students in separate and unequal settings when more integrated settings are available with sign language interpreters.

*Featherstone* and *Argenyi* demonstrate that deaf individuals are a growing and successful presence in the health sciences and that auxiliary aids and services such as sign language interpreters are commonplace. As Dr. Moreland testified, for instance, he had sign language interpreters for clinical courses in medical school and routinely uses sign language interpreters as part of his clinical practice including in Code Blue situations when he is the lead physician coordinating the team response to a patient medical emergency. Exhibit 6 at ¶¶6-8. Even in such emergency settings, he has used sign language interpreters to successfully treat patients and manage these patient emergencies. *Id.* at ¶8. Similarly, both Richard Rice and Diane Bass currently attend nursing programs and utilize qualified sign language interpreters for their clinicals and labs. *See* Exhibit 4 at ¶¶5-7; *see also* Exhibit 5 at

¶¶5-8. Their experiences demonstrate that sign language interpreters are routinely provided in clinical courses and in the course of clinical practice. Indeed, as Dr. Moreland states in his declaration, the number of deaf health care professionals who are members of the Association of Medical Professionals with Hearing Losses, an organization by and for deaf and hard of hearing health care professionals, continues to grow rapidly. Exhibit 6 at ¶10-11. Accordingly, the record demonstrates that without qualified ASL interpreters for clinicals and labs, Ms. Bellemore is deprived of recognized and accepted auxiliary aids and services that would provide her with effective communication and an equal opportunity to participate in the classroom.

### B.    Ms. Bellemore Will Suffer Irreparable Harm Without Preliminary Relief.

Like her ability to succeed on the merits, Ms. Bellemore can also establish the likelihood of irreparable harm if preliminary injunctive relief is denied. In *Gresham v. Windrush Partners, Ltd.*, the Eleventh Circuit held that "irreparable harm may be presumed … where … an injunction is authorized by statute and the statutory conditions are satisfied" or the purpose of the statute would be eviscerated without injunctive relief. 730 F.2d 1417, 1423 (11th Cir. 1984); *see, e.g.*, *United States v. Hayes*, 415 F.2d 1038, 1045 (5th Cir. 1969)[4]; *F.T.C. v. Career Info. Servs., Inc.*, No. CIV. A. 1:96-CV-1464, 1996 WL 435225, at *4 (N.D. Ga. June 21, 1996). Title III of the ADA and Section 504 of the Rehabilitation Act are civil rights statutes, *Association of Disabled Americans v. Neptune Designs*, 469 F.3d 1357, 1359 (11th Cir. 2006), *Lussier v. Dugger*, 904 F.2d 661, 665 (11th Cir. 1990), that

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

authorize the granting of injunctions. 28 C.F.R § 36.501; 29 U.S.C. § 794(a). Title III of the ADA was enacted to address "various forms of discrimination" that "individuals with disabilities continually encounter," including "communication barriers." *Rendon v. Valleycrest Prod., Ltd.*, 294 F.3d 1279, 1286 (11th Cir. 2002) (finding a valid Title III claim in plaintiffs' allegation that defendant's telephone line "screened out" deaf individuals). The court may grant individuals who have been harmed by a violation of the ADA equitable relief in the form of a temporary restraining order or a preliminary injunction. *See* 28 C.F.R. § 36.501; *see also Martin v. Metro. Atlanta Rapid Transit Auth.*, 225 F. Supp. 2d 1362, 1381 (N.D. Ga. 2002) (holding that a preliminary injunction was appropriate relief to ensure defendant's compliance with the ADA). Further, "[w]hen a civil rights statute is violated, 'irreparable injury should be presumed from the very fact that the statute has been violated.'" *EEOC v. Cosmair, Inc.,* 821 F.2d 1085, 1090 (5th Cir.1987).

In addition to this presumption, Ms. Bellemore can clearly establish irreparable harm absent a preliminary injunction. A school's failure to integrate students in a classroom setting has been found to be a deprivation of equal opportunity and thus constitutes irreparable harm. *See Ray v. Sch. Dist.*, 666 F Supp. 1524, 1535 (M.D. Fla. 1987) (finding irreparable injury arising from school's continued denial of an integrated classroom setting). The College's refusal to provide Ms. Bellemore with a qualified sign language interpreter for clinicals and labs not only robs her of the group experience integral to clinical courses, it fails to provide her with effective communication and full and equal enjoyment and/or meaningful access to participate in and benefit from her clinical classes. Without effective communication and equal access to the information conveyed in clinicals and labs and without access to

collaborative opportunities with her peers, Ms. Bellemore is now in a disadvantaged position relative to that of her classmates. She has missed substantive information from the lessons taught in the clinicals and labs; she is gravely concerned about the repercussions of this regarding her potential for success in the College nursing program and her future employment as a nurse. *See* Bellemore Decl. ¶¶23-24. As such, Ms. Bellemore has been and is deprived of educational opportunities necessary to advance her career and if not provided with the relief she currently seeks, her career will face additional delays to those she has already experienced at the College.

### C.    Balance of Hardship Weighs in Favor of a Preliminary Injunction.

The harm to Jersey College resulting from a grant of Ms. Bellemore's motion would be minimal compared to the irreparable harm that Ms. Bellemore would suffer in continuing mandatory coursework without effective communication and equal access to the clinicals and labs.

In *Alejandro v. Palm Beach State College,* the defendant refused to allow the plaintiff to bring her service dog into the classroom, even though it allowed her to bring the service dog onto campus. 843 F. Supp. 2d 1263, 1271 (S.D. Fla. 2011). The court there held that an accommodation could not be a substantial burden for the college in a classroom setting when it had already permitted such accommodation elsewhere on campus. *Id*. The court in *Alejandro* also found that any disruption to other students that the service dog may have posed "does not tilt the threatened injury in Defendants' favor." *Id.*

As in *Alejandro*, here the College already provides ASL interpreters to Ms. Bellemore for classroom lectures that constitute the majority of her schedule; it is entirely unclear how

or why the interpreters would distract other students and delay the clinical and lab experience, as the College suggests. *See* Exhibit 3. Indeed, "interpreter services are merely a means to translate communications and is a simultaneous process between converting English into American Sign Language. The interpreter is nothing more than a communication aid. Such aid, while adding another person in the room, is not altering the fact that Plaintiff will have to successfully complete the labs, communicate with patients, and complete the clinical program, just as his classmates would." *Featherstone*, 2014 U.S. Dist. LEXIS 102713, at *12. Similarly, the Tenth Circuit has explained that society has "come to view such interpreters more as part of the background than as independent participants" in rejecting a challenge to the presence of a sign language interpreter during jury deliberations. *United States v. Dempsey*, 830 F.2d 1084, 1091-92 (10th Cir. 1987) (holding that the presence of an interpreter in the jury room did not impermissibly affect deliberations). As these courts recognize, interpreters merely exist in the background as facilitators who enhance communication.

The fact that interpreters are a non-disruptive and accepted presence in the classroom and elsewhere is further supported by the testimony of nursing students Bass and Rice, as well as by Dr. Moreland. *See* Exhibit 4 ¶¶10-11; Exhibit 5 ¶¶14-15; Exhibit 6 ¶¶7-9; 12. Here, interpreters would play no role beyond ensuring that Ms. Bellemore has full and equal access to everything that is being said in clinicals and labs and would be no more distracting than the interpreter the College already provides in Ms. Bellemore's lectures. Because Ms. Bellemore cannot currently understand what is being said in clinicals and labs, the balance of hardships tips sharply in favor of granting her the relief she seeks.

20

### D.    A Preliminary Injunction Promotes the Public Interest.

The College's refusal to provide Ms. Bellemore an interpreter for her clinicals and labs is precisely the kind of discrimination that Congress sought to eradicate when it enacted the ADA "to remedy widespread discrimination against individuals with disabilities." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001). A preliminary injunction will fulfill Congress' goal in enacting the ADA—to ensure full and equal access for individuals with disabilities. Indeed, "the public has an interest in providing for the full participation by persons with disabilities[.]". *Tugg*, 864 F. Supp. at 1211.

A preliminary injunction would further serve the public interest because, as a recent task force recommended, more deaf health care professionals will increase deaf patients' access to health care. *See Building Pathways to Health Care Careers for the Deaf and Hard-of-Hearing Community*, March 2012, *available at* https://www.rit.edu/ntid/healthcare/task-force-report (last visited August 17, 2019). Ms. Bellemore seeks to obtain a degree in nursing in order to pursue a career as a deaf health care professional. A preliminary injunction would further the public interest by allowing Ms. Bellemore to achieve her professional goal and thus promote the very type of access to deaf patients the task force recommends.

### E.    The Court Should Issue the Preliminary Injunction Without Bond

Although Fed. R. Civ. P. 65 requires that a party seeking preliminary injunctive relief provide security in the form of a bond, "the bond requirement of Rule 65(c) is appropriately waived in certain circumstances. *See Baldree v. Cargill, Inc.*, 758 F. Supp. 704 (M.D. Fla. 1990), *aff'd*, 925 F.2d 1474 (11th Cir. 1991) (district court has discretion to waive bond

requirement imposed by Rule 65(c)). Courts considering whether to waive a bond look to three factors: "(1) the possible loss to the enjoined party; (2) the hardship that a bond would impose upon the applicant; and (3) the impact of a bond on the enforcement of federal rights." *Johnston v. Tampa Sports Auth.*, 2006 U.S. Dist. LEXIS 77614, *1-3, 2006 WL 2970431 (M.D. Fla. Oct. 16, 2006) (citations omitted). Here, appropriate circumstances exist that justify waiving the bond requirement. As shown above, Ms. Bellemore is substantially likely to succeed on her claims that the College has been and is discriminating against her by denying her the auxiliary aids and services (a qualified ASL interpreter) necessary for her to effectively communicate in the clinicals and labs, in violation of her federally protected rights. *See University Books & Videos, Inc. v. Metropolitan Dade County*, 33 F. Supp. 2d 1364, 1374 (S.D. Fla. 1999) (recognizing that courts have waived a bond requirement when, e.g., the party seeking an injunction "has a high probability of success in the merits of its claim."). Further, a bond would constitute a severe hardship on Ms. Bellemore, and would serve to stifle her ability to seek redress for the College's discriminatory actions. *See Johnston*, 2006 U.S. Dist. LEXIS 77614 at *4 (waiving the security requirement of Fed. R. Civ. P. 65(c), in part, because the imposition of a bond would impose a financial hardship on a plaintiff who sought to vindicate fundamental constitutional rights); *see also Temple Univ. v. White*, 941 F.2d 201, 220 (3rd Cir. 1991) ("A district court should consider the impact that a bond requirement would have on enforcement of such a right, in order to prevent undue restriction of it."). Ms. Bellemore has taken out student loans to finance her education, is a full-time student and a single parent supporting three (3) children while working on only a part-time basis. Bellemore Decl. ¶¶29-30. In contrast, the College has never claimed that

money is an issue when deciding to deny Ms. Bellemore the use of an ASL interpreter. *See, e.g.*, *Featherstone*, 2014 U.S. Dist. LEXIS 102713, at *20-21 (collecting cases) (waiving the bond requirement because the deaf plaintiff "is unlikely to have sufficient funds to afford the bond…and [the defendant] has repeatedly claimed money is not an issue.").

<u>**CONCLUSION**</u>

For the reasons stated above, this Court should enter an order for a temporary restraining order and/or preliminary injunction that requires Jersey College to provide Ms. Bellemore ASL interpreters for clinicals and labs.

DATED this 17th day of August, 2019.

Respectfully submitted,

*/s/ Sharon Caserta*
Sharon Caserta, Esq.
Florida Bar No.: 0023117
Morgan & Morgan
Deaf /Disability Rights
76 South Laura Street, Suite 1100
Jacksonville, FL 32202
(904) 361-0078 (Voice)
(904) 245-1121 (Videophone)
(904) 361-4305 (Facsimile)
scaserta@forthepeople.com

*Trial Counsel for Plaintiff*

(Attorney for Plaintiff gratefully acknowledges the support and work of Victoria Freytes from the Georgetown University Law Center.)